# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### LAREDO DIVISION

| | | |
|---|---|---|
| RAUL GARZA MARROQUIN, RAFAEL OLVERA AMEZCUA, and GIORGE GONZALEZ, | § § § § | |
| | § | |
| *Petitioners-Plaintiffs*, | § § | |
| | § | |
| v. | § § | |
| | § | |
| JOSE GARCIA LONGORIA JR., Officer in Charge, Port Isabel Service Processing Center; MARIO GARCIA, Warden, Webb County Detention Center; JAVIER ALEMAN, Warden, Rio Grande Detention Center; DANIEL BIBLE, Field Office Director, San Antonio Field Office, U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Acting Director of U.S. Immigration and Customs Enforcement; CHAD WOLF, Acting Secretary, U.S. Department of Homeland Security; and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, | § § § § § § § § § § § § § § § § | CIVIL ACTION NO. _____  PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| *Respondents-Defendants*. | § § | |

## PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT

This is a petition for a writ of habeas corpus and complaint filed on behalf of Petitioners-Plaintiffs Raul Garza Marroquin, Rafael Olvera Amezcua, and Giorge Gonzalez ("Petitioners"). Petitioners are uniquely vulnerable to contracting the novel coronavirus disease ("COVID-19") while in the physical custody of Respondents-Defendants ("Respondents") at the Port Isabel Service Processing Center, the Webb County Detention Center, and the Rio Grande Detention Center ("Detention Centers") in South Texas. By continuing to detain Petitioners in conditions that expose them to an impermissibly high risk of contracting COVID-19, Respondents violate Petitioners' rights under the Fifth Amendment to the U.S. Constitution. Petitioners also bring a

1

claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794. Petitioners seek a declaration and injunction to redress Respondents' unlawful civil detention and to ameliorate all conditions that preclude Petitioners from implementing the only known means of preventing their contraction of COVID-19 including, if necessary, an order requiring their immediate release from detention.

## INTRODUCTION

1.      On March 13, 2020, Governor Abbott declared a State of Emergency in Texas due to COVID-19, a global pandemic that has infected over 580,000 people in the United States and over 14,000 people in Texas. COVID-19 can have devastating effects on individuals' physical health. It can cause severe damage to lung tissue, kidney damage, liver damage, sepsis, respiratory failure, acute cardiac injury, heart failure, and death. Over 10% of infected people require hospitalization. COVID-19 has killed over 23,000 people in the United States in the past month, including over 300 Texans.

2.      Older individuals, immunocompromised individuals, and people with certain chronic health conditions including diabetes, asthma, heart conditions, and lung disease are at greater risk of contracting severe cases of COVID-19. Many fatalities in the United States due to COVID-19 have been older individuals and individuals with chronic underlying medical conditions.

3.      There is no vaccine or cure for COVID-19. The U.S. Centers for Disease Control and Prevention ("CDC") recommends preventative strategies like social distancing, intensive hand washing, decontamination of surfaces, wearing of masks or face coverings, and isolation of people who are ill as the only known ways to avoid COVID-19.[1]

---

[1] Centers for Disease Control and Prevention, "How to Protect Yourself," Mar. 18, 2020, *available at*: https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (accessed Apr. 12, 2020).

4.	Each Petitioner is at heightened risk of severe illness from COVID-19 due to their age or chronic underlying health conditions. Respondents prevent Petitioners from being able to practice even the most basic precautions while detained. Petitioners urge this Court to enjoin Respondents' ongoing unlawful detention so that Petitioners can practice the preventative strategies necessary to avoid becoming victims of this historic global pandemic.

## CUSTODY

5.	Petitioner-Plaintiff Raul Garza Marroquin is detained at the Port Isabel Service Processing Center in the physical and legal custody of the following Respondents:  Jose Garcia Longoria Jr., Officer in Charge, Port Isabel Service Processing Center; Daniel Bible, Field Office Director, San Antonio Field Office, U.S. Immigration and Customs Enforcement ("ICE"); Matthew T. Albence, Acting Director of ICE; Chad Wolf, Acting Secretary, U.S. Department of Homeland Security ("DHS").  Petitioner-Plaintiff Raul Garza Marroquin is under the direct control of Respondents and their agents.

6.	Petitioner-Plaintiff Rafael Olvera Amezcua is detained at the Webb County Detention Center in the physical and legal custody of the following Respondents:  Mario Garcia, Warden, Webb County Detention Center; Daniel Bible, Field Office Director, San Antonio Field Office, ICE; Matthew T. Albence, Acting Director of ICE; Chad Wolf, Acting Secretary, DHS. Petitioner-Plaintiff Rafael Olvera Amezcua is under the direct control of Respondents and their agents.

7.	Petitioner-Plaintiff Giorge Gonzalez is detained at the Rio Grande Detention Center in the physical and legal custody of the following Respondents:  Javier Aleman Warden, Rio Grande Detention Center; Daniel Bible, Field Office Director, San Antonio Field Office, ICE;

Matthew T. Albence, Acting Director of ICE; Chad Wolf, Acting Secretary, DHS. Petitioner-Plaintiff Giorge Gonzalez is under the direct control of Respondents and their agents.

## JURISDICTION

8.     This case arises under the United States Constitution and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

9.     The Court has jurisdiction over this habeas petition and complaint pursuant to 28 U.S.C. § 2241 (habeas corpus statute), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1361 (Mandamus Act), and Article 1, Section 9, clause 2 of the United States Constitution.

10.     Pursuant to 28 U.S.C. § 2241, district courts have jurisdiction to hear habeas petitions by noncitizens who challenge the lawfulness of their detention under federal law. *Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 794 (W.D. Tex. 2015).

11.     The Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57.

12.     The United States has waived sovereign immunity for this action for declaratory and injunctive relief against one of its agencies, and that agency's officers are sued in their official capacities. 5 U.S.C. § 702; 29 U.S.C. § 794.

## VENUE

13.     Venue in the Southern District of Texas is proper pursuant to 28 U.S.C. § 1391(b), because the Wardens and Officers in Charge of the detention centers where Petitioners are detained reside in this District, Petitioners are currently detained in this District, and a substantial part of the events and omissions giving rise to Petitioners' claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     Petitioners have exhausted their administrative remedies to the extent required by law, and their only remedy is by way of this judicial action.

15.     There is no statutory obligation for Petitioners to exhaust their administrative remedies prior to filing this habeas petition and complaint, since they are not requesting review of a final order of removal. 8 U.S.C. § 1252(d)(1) (requiring exhaustion of administrative remedies prior to challenging removal order in circuit court).

16.     Petitioners have no administrative remedies to exhaust through ICE because no process exists to challenge the unconstitutional conditions of their detention. Even if meaningful administrative remedies were available, Petitioners, as noncitizens challenging the lawfulness of their ongoing immigration detention, are not required to exhaust them under 8 U.S.C. § 2241.

## PARTIES

17.     Petitioner-Plaintiff RAUL GARZA MARROQUIN is an immigration detainee at the Port Isabel Service Processing Center, more commonly known as the Port Isabel Detention Center ("PIDC") in Los Fresnos, Texas. He is a 78-year-old lawful permanent resident who has lived in the United States since 1980 and has several serious medical conditions.  The U.S. government has never issued a Notice to Appear for Mr. Garza, yet Respondents have held him at PIDC for five weeks while the number of COVID-19 cases grows exponentially in Texas, and one contractor at PIDC has already tested positive for COVID-19.

18.     If he contracts COVID-19, Mr. Garza is at high risk of serious injury or death. As there is no vaccine or cure for COVID-19, the CDC recommends self-isolation, staying six feet apart from other people, and following strict hygienic precautions. Mr. Garza cannot employ these precautions while detained at PIDC, where he must eat communally, use shared bathrooms, and

sleep in a communal space with dozens of other people, some of whom are within arm's reach. Although frequent handwashing is necessary to prevent COVID-19, Respondents and their agents refuse to provide him with regular access to soap, hand sanitizer, or other hygienic materials such as disposable paper towels or tissues. Despite the serious threat to his life and his need for disability accommodations, officials have denied Mr. Garza's request to be released to his home in Edinburg, Texas, where he could safely self-isolate.

19.     Mr. Garza suffers from hypertension, mixed hyperlipidemia, polyosteoarthritis, and pre-diabetes. These conditions substantially limit his major life activities including, but not limited to, functioning of his immune, circulatory, and endocrine systems. Mr. Garza has a record of and is regarded as having such impairments and limitations. He is at high risk for severe illness and death, exacerbated by the imminent risk of exposure to COVID-19 and the lack of precautions at PIDC. Mr. Garza has informed Respondent ICE that he is at higher risk for serious illness from exposure to COVID-19 due to these medical conditions.

20.     On March 27, 2020, undersigned counsel for Mr. Garza advised Assistant Field Officer Jose Longoria Jr. of Mr. Garza's grave health conditions and requested his immediate release. On March 31, 2020, Respondent Longoria Jr. denied Mr. Garza's request for release without providing a reason. To date, Respondents have not released Mr. Garza.

21.     Petitioner-Plaintiff RAFAEL OLVERA AMEZCUA is an immigration detainee at the Webb County Detention Center in Laredo, Texas.  He is a 62-year-old applicant for asylum and adjustment to permanent resident status and has lived in the United States since 2014.  Mr. Olvera was detained in the South Texas ICE Processing Center in Pearsall, Texas from May 24, 2019 until April 2, 2020 when ICE transferred him to the Webb County Detention Center.

22.    Mr. Olvera suffers from multiple medical conditions including but not limited to Type 1 diabetes (insulin dependent), hypertension (abnormally high blood pressure), hyperlipidemia (abnormally high concentration of fats or lipids in the blood), benign prostatic hypertrophy (enlarged prostate), depression, and osteoarthrosis (degenerative joint disease). These medical conditions substantially limit Mr. Olvera's major life activities including, but not limited to, the functioning of his immune, cardiovascular, circulatory, and endocrine systems. Mr. Olvera has a record of and is regarded as having such impairments and limitations. To prevent his health from deteriorating he must take several medications, avoid eating certain foods, and take insulin. Failure to do any of these could result in fatal repercussions.  Mr. Olvera's medical conditions also require close monitoring of his endocrine system, cardiovascular system, and mental state. Respondents are aware that Mr. Olvera may be at higher risk for serious illness from exposure to COVID-19 due to these medical conditions.

23.    Mr. Olvera cannot employ the precautions necessary to avoid contracting COVID-19 while detained at the Webb County Detention Center, where he shares a communal eating, restroom and recreation space with other people, some of whom are within arm's reach. Although frequent handwashing is necessary to prevent COVID-19, Respondents and their agents refuse to provide Mr. Olvera regular access to a sufficient quantity of soap, hand sanitizer, or other hygienic materials such as disposable tissues. Despite the serious threat to his life and his need for disability accommodations, officials have denied Mr. Olvera's request to be released to his home in San Antonio, Texas, where he could safely self-isolate.

24.    ICE is aware of Mr. Olvera's health conditions because he has been detained by ICE for close to a year.  In addition, on October 9, 2019, Mr. Olvera's attorney sent a letter informing ICE of Mr. Olvera's underlying medical conditions and stating that Mr. Olvera had not

been receiving the proper medication or dosages. Mr. Olvera's attorney sent a second letter to ICE on March 20, 2020 describing and documenting Mr. Olvera's medical conditions. The March 20 letter also requested Mr. Olvera's release in light of the extraordinary risk Mr. Olvera faces if he contracts COVID-19.

25.     Petitioner-Plaintiff GIORGE GONZALEZ is an immigration detainee at the Rio Grande Detention Center in Laredo, Texas. He is 28 years old. Mr. Gonzalez fled persecution and torture based on his political opinion in his home country of Cuba and sought refuge in the United States. He requested asylum at the port of entry in Laredo, Texas on or about July 2, 2019, and has been detained ever since.

26.     Giorge Gonzalez has experienced chronic and severe asthma since he was about two years old. This condition substantially limits Mr. Gonzalez's major life activities including, but not limited to, the functioning of his respiratory system. He has a record of and is regarded as having such an impairment and limitations. Mr. Gonzalez suffers frequent and severe asthma attacks and has been advised by medical professionals that he is particularly vulnerable to contracting airborne viruses as a result of his asthma. Although he has been prescribed and used medication to control his asthma for years, Respondents have deprived Giorge Gonzalez of his medication for months while he has been detained. Mr. Gonzalez has suffered multiple recent asthma attacks at the Rio Grande Detention Center. He is at high risk of contracting a severe case of COVID-19.

27.     Giorge Gonzalez has repeatedly informed Respondents and their agents about his chronic and severe asthma since he was first detained in July of 2019. On or about March 25, 2020, Mr. Gonzalez informed Respondents and their agents that he is at higher risk for serious illness from exposure to COVID-19 due to his medical condition, requested to be isolated from other

detainees, and made a written request for treatment and medication to better manage his asthma during the COVID-19 pandemic. As of the date of filing, Respondents have not responded to Mr. Gonzalez's request.

28. Respondent-Defendant JOSE GARCIA LONGORIA, JR. is sued in his official capacity as the Acting Officer in Charge of the PIDC. He is an employee of DHS. As the Acting Officer in Charge, he is the immediate physical custodian of Mr. Garza.

29. Respondent-Defendant MARIO GARCIA is sued in his official capacity as Warden of the Webb County Detention Center. As the Warden of the Webb County Detention Center, he oversees, directs, and controls the Detention Center. He is the immediate physical custodian of Mr. Olvera.

30. Respondent-Defendant JAVIER ALEMAN is sued in his official capacity as Warden of the Rio Grande Detention Center. As the Warden of the Rio Grande Detention Center, he oversees, directs, and controls the Detention Center. He is the immediate physical custodian of Giorge Gonzalez

31. Respondent-Defendant DANIEL BIBLE is sued in his official capacity as the Field Office Director for the San Antonio ICE office. He oversees all ICE/ERO functions and detainees in the San Antonio area, including detainees at PIDC, the Webb County Detention Center, and the Rio Grande Detention Center. He has legal custody over Petitioners and is authorized to release them.

32. Respondent-Defendant MATTHEW T. ALBENCE is sued in his official capacity as the Acting Director of ICE. In that capacity, he exercises authority over all ICE policies, procedures, and practices relating to ICE enforcement operations and detention facilities. He is responsible for ensuring that all people held in ICE custody are detained in accordance with law.

33.     Respondent-Defendant CHAD WOLF is sued in his official capacity as the acting Secretary of DHS. He is responsible for enforcing federal laws concerning border control and immigration. Defendant Wolf has direct authority over ICE, which is responsible for the civil detention of immigrants in the United States.

34.     Defendant U.S. Immigration and Customs Enforcement is a component agency of DHS. ICE detains Petitioners at the Detention Centers as part of a program or activity of an Executive agency and pursuant to federal immigration law.

## STATEMENT OF FACTS

i.   **COVID-19 is Spreading Quickly and Poses a Grave Risk of Serious Illness or Death, Especially for Particularly Vulnerable People.**

35.     COVID-19 is a highly infectious disease caused by a novel coronavirus, officially known as SARS-CoV-2.

36.     On March 11, 2020, the World Health Organization declared that the outbreak of COVID-19 had reached pandemic status.

37.     COVID-19 is easily transmitted. The numbers of confirmed cases and deaths in the United States continues to grow. At the time of filing, the total number of confirmed cases of COVID-19 in the United States is expected to double every seven days.[2]

38.     All persons in the United States are at some risk of COVID-19 given the increase in community transmission throughout the United States.[3]

---

[2] Max Roser, Hannah Ritchie, and Esteban Ortiz-Ospina, "Coronavirus Disease (COVID-19) – Statistics and Research," updated Apr. 14, 2020, *available at*: https://ourworldindata.org/coronavirus (accessed Apr. 14, 2020).

[3] Centers for Disease Control and Prevention, "Public Health Recommendations for Community-Related Exposure,*" available at* https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (accessed Apr. 13, 2020).

39.     Any adult who contracts the virus may experience life-threatening symptoms and death. The fatality rate is higher in men and increases significantly for people with advanced age and certain pre-existing medical conditions.

40.     COVID-19 can severely damage lung tissue, which requires an extensive period of hospitalization and rehabilitation, and in some cases, can cause permanent loss of respiratory capacity.

41.     COVID-19 may also target the heart, causing cardiac injury such as myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure.

42.     People with serious cases of COVID-19 describe painful symptoms, including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath. Those infected with COVID-19 may only experience a fever intermittently, however, and fever may not be present at all for some people such as the elderly, immunosuppressed, or those taking certain medications.[4]

43.     COVID-19 may also cause permanent kidney and neurological injury.

44.     These complications can manifest at an alarming pace. Individuals can show the first symptoms of COVID-19 infection in as little as two days after exposure, and conditions can seriously deteriorate in five days or sooner.

45.     People experiencing no symptoms can still spread COVID-19, making testing or seclusion of only those who are symptomatic an ineffective solution.

---

[4] Centers for Disease Control and Prevention, "Public Health Recommendations for Community-Related Exposure," available at https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (accessed Apr. 13, 2020).

46.     Most people who develop serious COVID-19 illness will need advanced medical support. This level of supportive care requires highly specialized equipment that is in limited supply, even in non-detention settings, and a team of dedicated medical care providers. People who recover from serious cases may need extensive rehabilitation.

47.     There is no vaccine against COVID-19 nor is there any known medication to prevent or treat infection.

48.     The only known effective measures to reduce the risk of illness, injury, or death from COVID-19 are to prevent individuals from being infected in the first place. The CDC advises that COVID-19 spreads mainly between people who are in close contact with another, through respiratory droplets produced when someone speaks, coughs, or sneezes, and through aerosolized fecal contact, as well as through the touching of shared surfaces. The virus may remain viable from hours to days on surfaces made from a variety of materials.[5]

49.     The primary effective measures for protecting people from COVID-19 are (1) social distancing, *i.e.*, remaining physically separated from others regardless of their symptoms or lack of symptoms; and (2) vigilant sanitation and hygiene, including frequent hand washing with soap and water. The CDC now recommends that individuals who are in close proximity to others should wear cloth face coverings to mitigate the risk of transmission.

50.     The CDC recommends that older adults and those at higher risk for severe illness from COVID-19 stay home, wash their hands often, avoid close contact (within 6 feet), and clean and disinfect frequently touched services.[6] The CDC also recommends that older people have

---

[5] Centers for Disease Control and Prevention, "Public Health Recommendations for Community-Related Exposure," available at https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (accessed Apr. 13, 2020).
[6] Center for Disease Control, Coronavirus Disease 2019 (COVID-19): Older Adults, Apr. 7, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (accessed Apr. 14, 2020).

access to a support structure, and take care of their bodies, such as through balanced meals, regular exercise, and sufficient sleep.[7]

51.     Usage of personal protective equipment ("PPE") is only effective if accompanied by adequate training, including proper donning and doffing procedures.

52.     In recent days, the number of reported cases of COVID-19 infection in many parts of the country, including Cameron and Webb counties, have significantly increased and public officials estimate the reported number of hospitalizations and deaths may soon follow suit.

53.     Even when prevention and mitigation techniques are implemented, as of March 29, 2020, the nation's leading expert on infectious disease estimates that this pandemic could kill between 100,000 and 200,000 people in the United States.[8]

54.     At the time of filing, there are more than 580,000 confirmed COVID-19 cases in the United States and over 23,000 deaths.[9] The Texas Department of State Health Services ("DSHS") reports that there are more than 14,600 confirmed COVID-19 cases in Texas with 216 of those cases occurring in Cameron County and 206 occurring in Webb County.[10] Confirmation of COVID-19 cases is subject to the availability of accurate tests and the use of sufficiently inclusive testing protocols. Relatively few individuals have been tested for COVID-19 in Cameron and Webb counties and the number of individuals infected by COVID-19 may be much higher.

---

[7] *Id.*

[8] Bob Allyn, NPR, "Fauci Estimates That 100,000 To 200,000 Americans Could Die From The Coronavirus," Mar. 29, 2020, *available at*: https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus (accessed Apr. 14. 2020).

[9] Max Roser, Hannah Ritchie, and Esteban Ortiz-Ospina, "Coronavirus Disease (COVID-19) – Statistics and Research," updated Apr. 14, 2020, *available at*:  https://ourworldindata.org/coronavirus (accessed Apr. 14, 2020).

[10] Tex. Dep't of State Health Services, *"Texas Case Counts COVID-109: Coronavirus Disease 2019" available at*: https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (accessed Apr. 14, 2020).

55.     States have taken extraordinary and unprecedented measures to ensure residents practice "social distancing" in order to halt the spread of COVID-19. On March 13, 2020, Governor Abbott declared a State of Emergency in Texas due to COVID-19.[11] On March 27, 2020, Webb County Judge Tano E. Tijerina ordered all Webb County residents to "shelter at their place of residence" and that "the social distancing requirement of 6 feet shall be followed at all times."[12] On March 23, 2020, Cameron County Judge Eddie Treviño required all Cameron County residents to shelter in place to ensure as many people as possible self-isolated in order to slow the spread of COVID-19. When individuals use shared or outdoor spaces, the order requires that they "maintain social distancing of at least six feet from any other person . . . ."[13]

56.     Recognizing the extraordinary circumstances of COVID-19 and its major risk of spreading throughout institutionalized settings, the Texas Department of Criminal Justice ("TDCJ") has stopped the intake of inmates from county jails.  In a letter to county sheriffs on April 11, 2020, TDCJ Executive Director Bryan Collier cited COVID-19 prevention and said halting the transfers was "necessary and temporary" to protect employees and inmates.[14]

---

[11] Proclamation by the Governor of the State of Texas Certifying that COVID-19 Poses an Imminent Threat of Disaster in the State and Declaring a State of Disaster for All Counties in Texas, Mar. 13, 2020, *available at*: https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_03-13-2020.pdf (accessed Apr. 14, 2020).

[12] County Judge Tano E. Tijerina, Shelter in Place, Stay At Home/Work Safe Emergency Order, Mar. 27, 2020, *available at*: http://webbcountytx.gov/COVID-19/EmergencyOrder/3-27-2020Shelterinplace.pdf (accessed Apr. 14, 2020).

[13] County Judge Eddie Treviño, Jr., Third Supplemental Emergency Management Order with Mandatory Countywide Shelter in Place, Mar. 23, 2020, *available at*: http://www.cameroncounty.us/wp-content/uploads/2020/03/03.23.2020-Third-Supplemental-Emergency-Management-Order-with-Countywide-Shelter-in-Place.pdf (accessed Apr. 14, 2020).

[14] Jacob Helker, "Texas state prisons halt intake of inmates from county jails," ABC 7 News Online, Apr. 13, 2020, *available at*: https://abc7amarillo.com/news/local/tdcj-halts-intake-of-inmates-from-county-jails (accessed Apr. 14, 2020).

### ii. Respondents Expose Petitioners to COVID-19 Infection, Serious Illness, and Possible Death by Detaining Petitioners at the Detention Centers.

57.     Immigration detention facilities are "congregate environments," — places where people live and sleep in close proximity to each other. Infectious diseases that are communicated by air or touch are quickly spread in these confined settings. Respondents' ongoing detention of Petitioners in these crowded environments during the COVID-19 pandemic presents an imminent danger of severe infection, illness, and death to Petitioners.

58.     The CDC has issued guidance for correctional facilities and detention centers for preventing and managing the COVID-19 pandemic to ensure the safety of detained individuals, staff, contractors, and visitors to detention centers.[15]

59.     The CDC recommends that detention centers restrict transfers of detainees to and from other facilities and limit the amount of "operational entrances and exits to the facility."[16] Respondents do not follow this guidance. New detainees enter the Detention Centers at issue every day. Guards, ICE Deportation Officers, and contractors enter the facilities on a shift basis multiple times per day without adequate screening for COVID-19. Despite the CDC's guidance, Respondents continue to transfer detainees, including Mr. Olvera, between detention centers without engaging in the CDC's recommended screening process.[17]

60.     The failure to perform tests of staff or contractors who have ongoing community contacts presents a daily risk of introduction of the virus into the Detention Centers. The possibility of asymptomatic transmission means that monitoring only staff, contractors, and detainees who have fevers will fail to prevent transmission.

---

[15] CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," Mar. 23, 2020, *available at*: https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (accessed Apr. 14, 2020).

[16] *Id.*, at 9.

[17] *Id.*

61.     The CDC recommends that detention centers practice "intensified cleaning and disinfecting procedures" including disinfecting commonly used surfaces and objects "several times per day."[18] Respondents do not follow these directives at the Detention Centers. Individuals detained at the Detention Centers frequently use pay phones, tablets, toilets, showers, appliances like microwave ovens and common surfaces like chairs and dining tables without adequate disinfection between uses. The CDC recommends that detention centers provide adequate soap and hand sanitizer at no cost to detained individuals to encourage frequent hand washing.[19] Respondents routinely fail to provide sufficient free soap or hand sanitizer to detained individuals to permit compliance with the CDC's recommendation of frequent handwashing. Often additional soap is available for purchase at immigration detention center commissaries. Many detained individuals lack funds to purchase this basic hygiene product, especially if they have recently been forced to flee violence and persecution in their home country and seek refuge in the United States.

62.     The CDC also recommends that detention centers "implement social distancing strategies" in common areas, during recreation time, and during meals.[20] Nevertheless, Petitioners spend nearly all of their days in crowded dormitories with other detainees.

63.     Once COVID-19 is introduced to the Detention Centers under current conditions, it will be impossible to stop the spread of the virus within the facility, where social distancing is unachievable.

64.     Detention centers are integral components of the public health systems in the communities in which they are located. Detainees who contract severe cases of COVID-19 will require hospitalization in the community. This threatens to overwhelm local resources. The

---

[18] *Id.*
[19] *Id.*
[20] Id., at 11.

problem is particularly acute in areas such as the Rio Grande Valley, where medical supplies are limited and healthcare facilities may be quickly overwhelmed. The Texas Department of State Health Services confirms that the Rio Grande Valley has only 72 available intensive care unit beds and 143 ventilators.[21]

65. Prior outbreaks of infectious diseases among immigrants detained in the Rio Grande Valley have overwhelmed local healthcare infrastructure. For example, during a flu outbreak in the Rio Grande Valley in the summer of 2019, DHS officials testified that the hospitals in the Rio Grande Valley became "inundated" with individuals from CBP detention facilities who had flu-like symptoms.[22]

66. Immigration detention facilities in Texas have faced outbreaks of infectious diseases in recent years due to overcrowding, poor hygiene measures, medical negligence, and poor access to resources and medical care. For example, based on a review of a mumps outbreak in Texas facilities run by ICE Health Service Corps ("IHSC"), the CDC found that immigrant detention facilities in Texas, including PIDC,[23] exposed hundreds of detained migrants to mumps, leading the CDC to recommend that IHSC work with health departments, the CDC, and facility health administration to "develop appropriate control measures based on local epidemiology and the specific needs of each facility."[24] Mumps, unlike COVID-19, can be prevented through vaccination.

---

[21] Matthew Wilson, "DSHS: RGV Has 72 Available ICU Beds, 143 Ventilators," THE MONITOR, Mar. 27, 2020, *available at*: https://www.themonitor.com/2020/03/27/dshs-rgv-72-available-icu-beds-143-ventilators/ (accessed Apr. 14, 2020).

[22] *Gonzalez-Recinos v. McAleenan*, Case No. 1:19-CV-00138, Dkt No. 124, at 26 (S.D. Tex. 2020).

[23] Elizabeth Trovall, *"ICE Confirms 27 Cases of Mumps in Detention Facilities Across Texas,"* HOUSTON PUB. MEDIA, Feb. 14, 2019, *available at*: https://www.houstonpublicmedia.org/articles/news/2019/02/14/321862/ice-says-there-are-27-confirmed-cases-of-mumps-in-detention-facilities-across-texas/ (accessed Apr. 14, 2020).

[24] Jessica Leung et al., "Notes from the Field: Mumps in Detention Facilities That House Detained Migrants—United States, September 2018—August 2019," 68 U.S. DEP'T OF HEALTH & HUM. SERV. MORBIDITY & MORTALITY WEEKLY REP. 749, 749, Aug. 30, 2019, *available at*:
https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6834a4-H.pdf (accessed Apr. 14, 2020).

67.     In June 2019, the IHSC informed Congress of 308 infectious disease outbreaks across 51 facilities in a single year. Three of the facilities experiencing outbreaks that year were PIDC, Webb County Detention Center, and Rio Grande Detention Center.[25]

68.     On April 4, 2020, ICE determined that its Field Office Directors should reassess custody of detainees "over 60 years old" and detainees who are "immune-compromised," including individuals with "heart disease."[26] "The presence of one of those factors . . . should be a significant discretionary factor weighing in favor of release," unless release would pose a danger to property or persons.[27] Even for detainees with past criminal convictions, the Directors should look at the age of the arrest as a mitigation factor.[28]

69.     On or about April 13, 2020, thirty-three days after the World Health Organization declared COVID-19 to be a global pandemic, Respondent ICE issued a policy document for ICE detention facilities requiring detention facilities to take certain measures regarding COVID-19 ("ERO PRR").[29]

70.     The ERO PRR is inadequate to provide safe conditions for Petitioners.  It lacks deadlines, lacks a reporting or oversight structure by which to monitor compliance by detention facilities, lacks information on how detention facilities can procure hygiene supplies, PPE, or medical supplies, and it acknowledges but then ignores the fact that the coronavirus can be transmitted by asymptomatic and pre-symptomatic individuals. It fails to outline specific actions to be taken regarding medical monitoring, the provision of medical care within the detention

[25] "USA: 'We are Adrift, About to Sink,' Amnesty International, Apr. 7 2020, *available at*: https://www.amnesty.org/en/documents/amr51/2095/2020/en/ (accessed Apr. 14, 2020).

[26] Letter from Peter B. Berg, Assistant Director, Field Operations, to Field Office Directors and Deputy Field Office Directors entitled "COVID-19 Detained Docket Review," at 2-3, Apr. 04, 2020.

[27] *Id.* at 3.

[28] *Id.*

[29] ICE Enforcement and Removal Operations, "COVID-19 Pandemic Response Requirements," *available at*: https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (accessed Apr. 14, 2020).

facility, or the transfer of an individual requiring more intensive medical services or hospitalization.

71.     The Detention Centers where Petitioners are detained do not and cannot meet many of the requirements set out in the ERO PRR.

72.     As early as February 25, 2020, Dr. Scott Allen and Dr. Josiah Rich, medical experts for the U.S. Department of Homeland Security, shared concerns about the specific risks to immigrant detainees as a result of COVID-19 with the agency. These experts warned of the danger of rapid spread of coronavirus in immigration detention facilities. In a whistleblower letter to Congress, Dr. Allen and Dr Rich recommended that "[m]inimally DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." They concluded that "acting immediately will save lives not only of those detained, but also detention staff and their facilities, and the community-at-large."[30]

### a. The Port Isabel Service Processing Center

73.     Respondents confine Petitioner Garza and hundreds of other civil immigration detainees at PIDC. Currently, PIDC has capacity to hold up to 1,200 adult detainees and, when ICE adds plastic beds in cells as it has done as recently as July 2019, has a capacity of 1,550 individuals.[31] PIDC is operated by Ahtna Support and Training Services.

---

[30] Letter from Dr. Scott Allen & Dr. Josiah Rich to the Senate and House Committees on Homeland Security and Oversight and Reform, at 5-6, Mar. 19, 2020, *available at*: https://www.documentcloud.org/documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html (accessed Apr. 14, 2020).

[31] Dep't of Homeland Sec'y Office of Inspector General, *Management Alert—DHS Needs to Address Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley* OIG-19-51, at 9, July 02, 2019, *available at*: https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-51-Jul19_.pdf (accessed Apr. 14, 2020).

74. Data from the Transactional Records Access Clearinghouse at Syracuse University shows that, recently, as many as 36,000 individuals were detained in PIDC during one calendar year, suggesting that many people are frequently transferred into and out of the facility.

75. The conditions in PIDC contravene medical and public health directives for risk mitigation. Incoming detainees are inadequately screened for COVID-19. Until very recently no detainees were provided gloves, masks, or any other PPE. Guards, Deportation Officers, contractors, court staff, and others who enter the facility rarely wear PPE. Commonly used items and surfaces like telephones in the visitation area are infrequently disinfected. Respondents have limited detainees' access to basic hygiene products such as soap. Respondents detain individuals at PIDC in "pods," small areas that house several dozen individuals at a time. Detainees are forced to sleep just a few feet from one another in bunk beds.

76. Up to 140 individuals detained at PIDC had been placed in "lockdown" due to illness. According to the group, some immigrants held in PIDC reported that they were on a hunger strike due to their concerns about the government's failure to respond to the COVID-19 threat to their safety.[32]

77. On March 30, 2020, a contractor who works at PIDC tested positive for COVID-19. The individual's last shift at PIDC was that same day, March 30, 2020.[33] ICE has not reported the contractor's positive COVID-19 test on its public website. On information and belief, ICE does not include information on its website regarding positive COVID-19 test results of contractors at any ICE detention facilities.

---

[32] Press Release, *RGV Detention Facilities Must Release Migrants Now*, Mar. 30, 2020, *available at*: https://rgvequalvoice.org/pressreleases1/2020/3/30/rgv-detention-facilities-must-release-migrants-now (accessed Apr. 14, 2020).
[33] Valerie Gonzalez, "Valley Immigration Detention Contractor Tests Positive for Coronavirus," KRGV, Apr. 9, 2020, *available at* https://www.krgv.com/news/valley-immigration-detention-contractor-tests-positive-for-coronavirus/ (accessed Apr. 14, 2020).

### b. Mr. Garza Is Elderly, Frail, and Has Disabilities that Make Him Particularly Likely to Suffer Severe Complications Related to COVID-19.

78.     Mr. Garza is a lawful permanent resident. He has a well-established community and support system in the United States. He has lived in the United States for approximately 40 years and, since 2000, has made his home in Edinburg, Texas, with his wife and their nine children. Mr. Garza has strong social ties within the United States and is a long-integrated member of his community. His two youngest children, including one of whom he adopted, have mental disabilities and rely on Mr. Garza and his wife for care. Deeply attached to his father, Mr. Garza's adult child with disabilities continues to search for him on a daily basis.

79.     Mr. Garza was detained on March 13, 2020, weeks after DHS became aware of the risk of COVID-19 to elderly immigrants and immigrants with disabilities. The CDC warned that certain people are at higher risk for severe COVID-19 illness, particularly people aged 65 years and older, people with serious heart conditions, and people who are immunocompromised.[34] Approximately 80% of deaths reported in the United States were adults 65 years and older.[35] For adults who are above 65 years old, many require hospitalization and admission to intensive care units.[36]

80.     Mr. Garza has multiple risk factors that make him more likely to develop a severe illness and even die from COVID-19.

---

[34] Center for Disease Control, Coronavirus Disease 2019 (COVID-19): People Who are At Higher Risk, *available at*: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html (accessed Apr. 14, 2020).
[35] Center for Disease Control, Coronavirus Disease 2019 (COVID-19): Older Adults, *available at*: *availa*https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (accessed Apr. 14, 2020).
[36] *Id.*

81.     Mr. Garza is 78 years old with serious, well-documented health problems. He suffers from hypertension, mixed hyperlipidemia, and pre-diabetes—conditions that place him at greater risk of heart damage and failure. Mr. Garza also has been diagnosed with polyosteoarthritis, a degenerative condition that heightens the risk of lung complications. These medical conditions impair his ability to perform some everyday tasks.

82.     Despite being held for five weeks, ICE has not issued a Notice to Appear for Mr. Garza. The Notice to Appear is the charging document that DHS must file in order to proceed with the case before the immigration court. Mr. Garza is eligible to seek relief before an immigration judge by applying for cancellation of removal for lawful permanent resident under 8 USC 1229b(a).

83.     Mr. Garza's age and disabilities were readily apparent when DHS detained Mr. Garza and sent him to PIDC. DHS made this decision even though its officials were aware that COVID-19 was spreading across the United States and that people like Mr. Garza were at heightened risk.

84.     Due to the conditions of detention at PIDC, Mr. Garza finds it impossible to maintain the recommended distance of six feet from others. Defendants hold Mr. Garza in conditions where he sleeps less than six feet away from others in a room full of people with whom he shares a bathroom and eating space. He must also touch shared objects and surfaces that are not disinfected after others' use.

85.     Due to these conditions, Mr. Garza is not able to follow the CDC's recommendations, such as social distancing, rigorous hygiene, separated sleeping and eating, getting plenty of sleep, and accessing support structures.

86.     Respondents' actions and failures to act have placed Mr. Garza directly in harm's way. Mr. Garza is in the same room, or "pod," with 65 to 70 other people. As recently as two weekends ago, three individuals in Mr. Garza's pod were sick with COVID-19-like symptoms. One slept two beds away from him.

87.     Starting on March 28, 2020, Mr. Garza repeatedly asked the guards to help one of the men who was ill with a fever and asked the guards to take the ill man to the doctor. The guards refused. Finally, on March 29, 2020, officials wearing protective gear took the three men from the room, leaving Mr. Garza and dozens of others in the potentially infected room. Despite likely being exposed to a person with coronavirus symptoms, the only step that officials took was to give Mr. Garza a mask. Officials did not even disinfect the room.

88.     At that point, Mr. Garza's room was placed under "quarantine." Under "quarantine," Mr. Garza and the other 65-70 detainees were prohibited from leaving the potentially contaminated room for more than a few minutes at a time. Mr. Garza and his fellow detainees were forced to eat meals within that room. Officials did not check the temperatures of individuals under "quarantine" to evaluate whether an infection was spreading.

### c.  The Webb County Detention Center

89.     Defendants confine Petitioner Olvera and other civil immigration detainees at the Webb County Detention Center, a privately-owned facility operated by CoreCivic, formerly known as the Corrections Corporation of America. CoreCivic maintains that the Webb County Detention Center has the capacity to hold up to 480 adult detainees but as recently as July 2019 it held 526 detainees.[37]

---

[37] Transactional Records Access Clearinghouse, "ICE Data Snapshots as of July 2019," *available at*: https://trac.syr.edu/phptools/immigration/detention/ (accessed Apr. 13, 2020).

90.    At the Webb County Detention Center, detainees are provided with only a small bottle of shampoo, a small bar of soap, and toilet paper once a week.  Detainees must use the soap to wash their bodies in the shower and to wash their hands after they use the restroom. Sometimes detainees use their own soap to clean the tables in their communal living areas and cells.  In order to obtain more soap or shampoo, detainees must purchase them.  Some detainees run out of shampoo and soap before the week ends and they are forced to shower and wash their hands with only water. Some detainees also run out of toilet paper before the week ends and they have to use the restroom without any toilet paper until they are given more by the guards.

91.    Mr. Olvera is detained in a living area ("pod") that currently holds seven people. Mr. Olvera sleeps in a cell and shares a common area with the other six individuals in the pod; the common area contains a sink, shower, two toilets, three tables with seats, a microwave oven, and two telephones.  There are no paper towels or disposable tissues in the common area. There is no shampoo or soap provided in the shower other than the small soap and small shampoo issued to each detainee on a weekly basis.

92.    Three times a day, a guard pushes a cart containing meals to the door of the communal area of the pod.  The guard does not wear any protective equipment, such as gloves or a facemask. The cart also contains trays for other pods and none of the food trays, cups, or utensils are covered. The guard passes the uncovered trays and cups through an opening in the door.

93.    The three tables and seats are the only places to sit in the common area of the pod and they are bolted in place with the seats affixed less than six feet apart.  The telephones are also attached to the wall less than six feet apart.  Mr. Olvera and his fellow detainees frequently touch the shared surfaces in the common area, including the sink, shower, toilets, microwave oven, seats, tables and television remote control.

94.    Each morning a guard brings a mop, broom, dustpan, bucket, cleaning liquids, and a trash bag to the pod so that Mr. Olvera and the other detainees can clean their cells, community area, and shower. Detainees are not provided any protective equipment for cleaning, including gloves or facemasks. One detainee uses the cleaning supplies to clean his cell and then passes the supplies to the next detainee until they have all used the same equipment and supplies to clean their cells. The detainees in the pod also clean the community area and shower.

95.    Mr. Olvera is not aware of any social distancing rules in place at the Webb County Detention Center.  He has not seen any signage in the detention center about washing hands because of COVID-19. He has not seen any disinfecting spray or wipes for detainees to use.

96.    On the morning of April 14, 2020, Mr. Olvera observed guards enter his pod's common area and spray liquid.  The guards then offered flu shots to the detainees in the pod and gave them each one paper mask, without instructions on how or when to use the mask.  The guards handed the detainees a substance described as hand sanitizer but then later returned and took back the substance and instead gave the detainees liquid soap.

97.    Twice a day, a guard escorts Mr. Olvera from his pod down a long hallway to the clinic to receive his insulin medication.  Mr. Olvera routinely passes other detainees and guards when he is escorted to the clinic.  Mr. Olvera has never seen any detainees or guards wear protective equipment such as gloves or masks, other than one guard who wore a face mask inside the clinic on one occasion.

98.    Mr. Olvera has not seen the guards or other staff take detainees' temperature daily to determine if any of them have a fever.  He has not seen any posters or other materials in the Webb County Detention Center regarding COVID-19 or instructing the detainees to see the doctor

if they develop COVID-19 symptoms. Mr. Olvera has not seen doctors or nurses at the Webb County Detention Center giving the detainees any information on COVID-19.

99.     Mr. Olvera is not allowed to leave his pod except for twice daily visits to the clinic for his insulin medication.  He has not been outdoors since his arrival at the Webb County Detention Center.

100.    The conditions at the Webb County Detention Center contravene medical and public health directives for risk mitigation.

> ### d.  Mr. Olvera's Health Conditions and age Make him Particularly Likely to Suffer Severe Complications Related to COVID-19.

101.    Mr. Olvera is a 62-year-old applicant for asylum and adjustment to permanent resident status.  He has strong community ties in the United States where he has lived since 2014. He lives in San Antonio with his wife; his son, daughter-in-law and grandchildren live nearby in the same neighborhood.

102.    From May 24, 2019 to April 2, 2020, Mr. Olvera was detained by ICE at the South Texas ICE Processing Center in Pearsall, Texas.  On April 2, 2020, ICE transferred Mr. Olvera by van 113 miles to the Webb County Detention Center in Laredo, Texas.  Mr. Olvera rode in the van with eight other detainees and two guards, none of whom wore face masks or gloves.

103.    ICE transferred Mr. Olvera to the Webb County Detention Center after ICE announced that it had confirmed cases of COVID-19 infection among immigration detainees in New Jersey and Arizona and after the CDC issued its guidance urging specific safety practices at detention facilities.  The CDC warned that certain people are at higher risk for severe illness from COVID-19, particularly people with diabetes (like Mr. Olvera), people with serious heart conditions, and people who are immunocompromised.[38] The CDC also identified individuals with

---

[38] *Supra*, at note 31.

hypertension (such as Mr. Olvera) as being at higher risk for increased illness severity and adverse outcomes with COVID-19.[39]

104.    Mr. Olvera has multiple risk factors that make him more likely to develop a severe illness and even die from COVID-19.  Mr. Olvera suffers from serious, well-documented health problems including but not limited to Type 1 diabetes (insulin dependent), hypertension (abnormally high blood pressure), hyperlipidemia (abnormally high concentration of fats or lipids in the blood), benign prostatic hypertrophy (enlarged prostate), depression, and osteoarthrosis (degenerative joint disease).

105.    Due to his conditions of detention, Mr. Olvera cannot maintain the recommended distance of six feet from others. Respondents hold Mr. Olvera in conditions where he shares a restroom, food preparation, eating and recreation area with others in close quarters.  He must also frequently touch or share objects used by others.

106.    Due to these conditions, Mr. Olvera is not able to follow the CDC's recommended approaches, such as social distancing, rigorous hygiene, and separated sleeping and eating areas. Respondents' actions and failure to act have placed Mr. Olvera directly in harm's way.

### e.  The Rio Grande Detention Center

107.    Defendants detain Giorge Gonzalez at the Rio Grande Detention Center in Laredo, Texas. Rio Grande Detention Center is a facility operated by GEO Group, Inc. on behalf of ICE and the U.S. Marshals Service. Rio Grande Detention Center houses civil immigration detainees and federal criminal detainees. The facility has capacity to hold up to approximately 1,900 total detainees. As of July 2019, 707 individuals were detained at Rio Grande Detention Center in ICE

---

[39] Center for Disease Control, "Coronavirus Disease 2019 (COVID-19): Clinical Care," *available at*: https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (accessed on April 13, 2020).

custody.[40] More than 13,000 individuals were detained at Rio Grande Detention Center during a recent calendar year.[41]

108. People detained at Rio Grande Detention Center in ICE custody share small pods with as many as 80 other individuals. Mr. Gonzalez's pod held 84 individuals until approximately April 13, 2020, when several detainees were removed. Two new detainees were assigned to Mr. Gonzalez's pod on about April 15, 2020. As of the time of filing, there are approximately 63 individuals in Mr. Gonzalez's pod. New detainees are brought to the facility and assigned to crowded pods at Rio Grande Detention Center nearly every day, without proper screening for COVID-19.

109. The detainees sleep on bunk beds just a few feet from one another. Meals are served to all detainees at once. The detainees eat together at the same time at the same tables in their living space. Apart from brief periods of recreation time when the detainees leave their pods, Mr. Gonzalez must constantly remain in close proximity with dozens of other detainees. He is not able to comply with CDC recommendations regarding social distancing to prevent the spread of COVID-19 under the current conditions at Rio Grande Detention Center.

110. The individuals detained in Mr. Gonzalez's pod share many common items and surfaces without any means of disinfecting them between uses. For example, all of the detainees share pay phones that they use to communicate directly with their family members and attorneys outside of the detention center. There are no cleaning products available to disinfect the phone between uses. The individuals in Mr. Gonzalez's pod also share tablets for sending paid messages to people outside of the detention center via a web-based application, toilets, and many other

---

[40] Transactional Records Access Clearinghouse, "Immigration and Customs Enforcement Detention" *available at*: https://trac.syr.edu/phptools/immigration/detention/ (accessed Apr. 13, 2020).

[41] Transaction Records Access Clearinghouse, "Detainees Leaving ICE Detention from the Rio Grande Detention Center," *available at*: https://trac.syr.edu/immigration/detention/201509/RGRNDTX/exit/ (accessed Apr. 13, 2020).

common surfaces. These commonly-used items are not disinfected between use and become a potential source of transmission of COVID-19.

111.    Typically the detainees at Rio Grande Detention Center are required to clean their own dormitories. The detainees in Mr. Gonzalez's pod have been provided a rag, a broom, a mop, and bucket of water, but no other cleaning solvent for cleaning the floor or other surfaces in the dormitory.

### f. Giorge Gonzalez's Health Condition Makes Him Particularly Likely to Suffer Severe Complications Related to COVID-19.

112.    Giorge Gonzalez is a 28-year-old man from Cuba. He fled persecution and torture based on his political opinion in his home country and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") after presenting himself to U.S. immigration officials at the port of entry in Laredo, Texas on July 2, 2019. He has been detained at Rio Grande Detention Center since approximately July 4, 2019.

113.    Giorge Gonzalez has chronic and severe asthma. He was originally diagnosed as a young child. Throughout his life Mr. Gonzalez's asthma has required constant monitoring and treatment by medication. As an adult Mr. Gonzalez has been prescribed medication to treat and manage his asthma. As a result of his asthma, Mr. Gonzalez is unable to play sports or run even short distances without experiencing extreme shortness of breath, pain, and tightness in his chest. He must avoid air containing dust particles and strong fumes that exacerbate his condition and can cause acute asthma attacks.

114.    Respondents are well aware of Mr. Gonzalez's chronic condition. On or about July 4, 2019, shortly after immigration officials transferred him to Rio Grande Detention Center, Mr. Gonzalez informed medical personnel of his asthma.  He has repeatedly requested that ICE provide

treatment and medication to him so that he can properly manage his condition but Respondents have failed to provide him any asthma medications while he has been detained.

115.    Giorge Gonzalez has experienced multiple acute asthma attacks during his detention at the Rio Grande Detention Center.

116.    Shortly after he learned of the rapid spread of COVID-19, Giorge Gonzalez made a written request to medical personnel for appropriate treatment and medication so that he would better be able to manage his condition during this period of heightened risk of infectious disease. He has also requested to be isolated from other detainees as fear of a confirmed case of COVID-19 has spread throughout the detention center. Respondents refuse or are unable to accommodate Mr. Gonzalez's requests.

117.    Mr. Gonzalez is detained in close quarters with about 63 other detainees. He sleeps on a bunk bed just a few feet from other detainees. All of the detainees eat at the same time at the same tables, use the same pay phones without disinfection between uses, use the same toilets, and share numerous other items. Until recently when his dorm was placed under quarantine, no detainees or guards or other contractors who entered his dormitory wore gloves or masks to protect against the release of respiratory droplets known to efficiently spread COVID-19.

118.    No soap or hand sanitizer has been provided for detainees to use to clean their hands in Mr. Gonzalez's dorm. He and the other detainees are infrequently assigned a small amount of shampoo. That amount is insufficient for practicing the frequent and aggressive hand-washing recommended by public health officials for preventing the spread of COVID-19.

119.    On or about April 6, 2020, a detainee in Mr. Gonzalez's dorm became ill and feverish. The sick detainee was removed from the dorm room that day. In the early morning hours of April 9, 2020, the entire dorm was placed under quarantine and detainees in Mr. Gonzalez's pod were provided face masks. On or about April 10, 2020, guards came into Mr. Gonzalez's pod

and took the masks away. Mr. Gonzalez remains confined in close proximity with approximately 63 other detainees.

120.    Respondents continue to detain Giorge Gonzalez in dangerous conditions despite the availability of family and close friends who have offered to support Mr. Gonzalez upon his release from detention. Mr. Gonzalez submitted a parole request indicating that his brother-in-law, who is a lawful permanent resident living in Houston, Texas, offered to sponsor and support Mr. Gonzalez while his immigration case is adjudicated. Mr. Gonzalez and his brother-in-law were close friends in Cuba and have remained close friends since Mr. Gonzalez's brother-in-law relocated to the United States. Another close family friend from Cuba, who is now a lawful permanent resident of the United States residing in Miami, Florida, has also offered to support Mr. Gonzalez if he is released.

121.    Giorge Gonzalez poses no flight risk or danger to the community if he is released from Rio Grande Detention Center and received by one of his sponsors.

122.    On about August 29, 2019, an asylum officer determined that Mr. Gonzalez has a credible fear of further persecution and torture if he is returned to Cuba and referred him for removal proceedings under 8 U.S.C. § 1229a.

123.    On March 9, 2020, an Immigration Judge denied Mr. Gonzalez's requests for relief from removal and ordered him removed to Cuba. Giorge Gonzalez has appealed this decision to the Board of Immigration Appeals ("BIA") where he is represented by counsel. There is no final order of removal in his immigration case. 8 U.S.C. § 1101(a)(47)(B) (removal orders "shall become final upon the earlier of (1) a determination by the [BIA] affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the [BIA]."). His immigration proceedings are expected to continue for several more months.

# CLAIMS FOR RELIEF

## CLAIM ONE

### Fifth Amendment to the U.S. Constitution (Due Process Clause)

124.    Petitioners repeat and incorporate by reference the allegations made above.

125.    The Fifth Amendment to the U.S. Constitution requires that all individuals who are detained by the State be afforded conditions of reasonable health and safety including food, shelter, and medical care.

126.    Respondents subject Petitioners to conditions of confinement that heighten their risk of contracting COVID-19.

127.    Respondents act with deliberate indifference to the excessive risk of harm to Petitioners' health and safety posed by COVID-19. Respondents are aware of Petitioners' advanced age and underlying health conditions and of their heightened risk of serious illness or death if infected with COVID-19. Respondents are aware that the conditions at the Detention Centers expose Petitioners to greater risk of infection. By subjecting Petitioners to this risk, Respondents fail to ensure safety and health in violation of Petitioners' due process rights. Respondents further violate Petitioners' due process rights by failing to take action to ameliorate the conditions that prevent Petitioners from adopting the only known means of protecting themselves from infection, or by failing to release them.

128.    The Fifth Amendment to the U.S. Constitution also requires that civil detainees must not be subjected to conditions that amount to punishment. The government violates this substantive due process right when it subjects civil immigration detainees to cruel treatment and conditions of confinement that amount to punishment, and fails to ensure detainees' health and safety.

129. Separately and cumulatively, regardless of Respondents' intent, the following conditions amount to a violation of due process rights of Petitioners who are civil detainees:

    a.   denial of soap, hand sanitizer, and other hygiene products to Petitioners;

    b.   failure to clean and decontaminate adequately frequently used common items and surfaces;

    c.   continuous detention of Petitioners in crowded conditions that preclude social distancing;

    d.   failure to monitor detainees for COVID-19 on a regular basis;

    e.   failure to screen adequately incoming detainees, guards, ICE Deportation Officers, contractors and visitors for COVID-19 before they enter the Detention Centers; and

    f.   denial of access to the outdoors and natural light sunlight; and

    g.   failure to provide treatment or medication to Petitioner Giorge Gonzalez to manage his chronic underlying health condition.

130. The conditions of confinement are not reasonably related to a legitimate goal of detention.

131. Respondents' actions amount to and are intended as punishment and violate Petitioners' due process rights.

132. Respondents hold Petitioners in custody in violation of the Fifth Amendment to the United States Constitution. A writ of habeas corpus, pursuant to 28 U.S.C. § 2241, is necessary to remedy the constitutional violations, to ensure Petitioners receive necessary medical care, and to remove the unreasonable risk that Petitioners will contract COVID-19 and suffer serious physical injury and harm.

133.    Alternatively, if the Court denies a writ of habeas corpus, declaratory and injunctive relief to compel Respondents to provide safe conditions is needed to remedy Respondents' violation of the Fifth Amendment and to prevent serious, imminent, irreparable physical injury to Petitioners.

## CLAIM TWO

**Violation of the Rehabilitation Act—Failure to Provide Reasonable Accommodation to Persons with Disabilities**

134.    Petitioners reallege and incorporate by reference the allegations made above.

135.    Section 504 of the Rehabilitation Act ("Section 504") provides that "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

136.    Section 504 of the Rehabilitation Act requires federal agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

137.    DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; *see also* 29 U.S.C. § 794(a). The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect

of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

138.    Defendant ICE is an Executive agency within the meaning of the Rehabilitation Act.

139.    Petitioners are qualified individuals with disabilities for the purposes of Section 504.

140.    The services, programs, and activities within the Detention Centers receive substantial federal financial assistance and are programs and activities conducted by an Executive agency.  The removal process, including adjudications of applications for relief from removal, is a benefit administered by DHS. Plaintiffs are entitled to participate in that benefit.

141.    By failing to take account of Petitioners' vulnerability to severe illness or death if they contract COVID-19 and by exposing Petitioners to a heightened risk of contracting COVID-19, Respondents intentionally prevent Petitioners from participating in the removal process and the services, programs, and activities within the detention centers by reason of their disabilities.

142.    Respondents' actions have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the detention facilities with respect to Petitioners.

143.    Respondents fail to "reasonably accommodate" Petitioner's disabilities by failing to ameliorate the conditions that prevent Petitioners' from employing the only known means of protecting themselves from infection or by failing to release Petitioners from the Detention Centers.

144.    Respondents' disparate treatment of Petitioners based on their disabilities, Respondents' use of criteria or methods of administration with respect to the removal process and

the services, programs, and activities within the Detention Centers, and Respondents' failure to provide Petitioners' with reasonable accommodations constitute disability discrimination in violation of Section 504.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray that this Court grant the following relief:

A. Assume jurisdiction over this matter;

B. Declare Petitioners' detention to be unlawful and unconstitutional;

C. Order the immediate release of Petitioners or their placement in community-based alternatives to detention such as conditional release, with appropriate precautionary health measures;

D. In the alternative, if the Court does not grant a writ of habeas corpus, order Respondents to provide Petitioners with protection from the risk of contracting COVID-19 by ameliorating all conditions that prevent Petitioners from implementing the public health recommendations that are the only known means of preventing against and mitigating the effects of COVID-19;

E. Enjoin Respondents from transferring Petitioners outside of this judicial district pending litigation of this matter or their removal proceedings;

F. Award to Petitioners reasonable costs and attorneys' fees; and,

G. Grant any other relief that this Court deems just and proper.

Dated: April 15, 2020    Respectfully submitted,

**GARCÍA & GARCÍA ATTORNEYS
AT LAW, P.L.L.C.**
By: _/s/ Carlos Moctezuma Garcia_
Carlos Moctezuma García
*Attorney in Charge*
Texas Bar No. 24065265

SDTX Bar No. 1081768
P.O. Box 4545
McAllen, TX 78502
Phone: 956-630-3889
Facsimile: 956-630-3899
Email: cgarcia@garciagarcialaw.com
*Attorney for Petitioner Raul Garza Marroquin*

**TEXAS CIVIL RIGHTS PROJECT**
By: */s/ Efrén C. Olivares*
Efrén C. Olivares
State Bar No. 24065844
SDTX Bar No. 1015826
Email: efren@texascivilrightsproject.org
Carolyn O'Connor*
CT State Bar No. 441082
Email: carrie@texascivilrightsproject.org
Andrew Udelsman
NY State Bar No. 5612544
SDTX Bar No. 3467581
Email: andy@texascivilrightsproject.org
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171 ext. 121
*Attorneys for Petitioner Raul Garza Marroquin*

**TEXAS RIOGRANDE LEGAL AID, INC.**
By: */s/ Peter McGraw*
Peter McGraw
State Bar No. 24081036
S.D. Tex. No. 2148236
Email: pmcgraw@trla.org
Rebecca Sheff
State Bar No. 24113476
S.D. Tex. No. 3428184
Email: rsheff@trla.org
1206 East Van Buren St.
Brownsville, Texas 78520
Phone: (956) 982-5543
Fax: (956) 541-1410
*Attorneys for Petitioner Giorge Gonzalez*

**LAW OFFICE OF JAVIER N. MALDONADO, PC**
By: _/s/ Javier N. Maldonado_
Javier N. Maldonado
Tex. Bar No. 00794216
Fed. Adm. No. 20113
8620 N. New Braunfels, Ste. 6-5
San Antonio, Texas 78217
Tel.: (210) 277-1603
Fax: (210) 587-4001
Email: jmaldonado.law@gmail.com
*Attorney for Petitioner Rafael Olvera Amezcua*

**MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND**
By: _/s/ Nina Perales_
Nina Perales
Tex. Bar No. 24005046
SD of Tex. No. 21127
Email: nperales@maldef.org
Daniel Hatoum*
State Bar No. 24099136
Email: dhatoum@maldef.org
Fátima Menéndez*
State Bar No. 24090260
Email: fmenendez@maldef.org
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
*Attorneys for Petitioner Rafael Olvera Amezcua*

*Application to appear *pro hac vice* forthcoming

## Verification Pursuant to 28 U.S.C. § 2242

The undersigned counsel submit this verification on behalf of the Petitioners. Undersigned counsel have discussed with Petitioners the events described in this Petition for Writ of Habeas Corpus and Complaint and, on the basis of those discussions, verify that the statements in the Petition and Complaint are true and correct to the best of our knowledge.

Dated: April 15, 2020

*/s/ Carlos Moctezuma Garcia*
Carlos Moctezuma García
Attorney for Petitioner Raul Garza Marroquin

*/s/ Peter McGraw*
Peter McGraw
*/s/ Paulina Baca*
Paulina Baca (paralegal)
Attorney for Petitioner Giorge Gonzalez

*/s/ Javier N. Maldonado*
Javier N. Maldonado
Attorney for Petitioner Rafael Olvera Amezcua